## United States District Court
## District of Massachusetts

_____
                                )
UNITED STATES,                  )
                                )
        v.                      )
                                )    Criminal Case No.
RUSSELL C. ROSE,                )    11-10062-NMG
KELVIN FRYE,                    )
OMAY A. FORD,                   )
MICHAEL ANDREWS,                )
KYLE HICKS,                     )
ADALBERTO GRACIANI,             )
ANTHONY VAUGHN,                 )
STEFAN PINA,                    )
DELRICO GRAHAM,                 )
JONATHAN MCGEE-BAKER,           )
RICHARD JACKSON,                )
BONNIE BEARSE,                  )
THOMAS GILSON,                  )
JEREMY WOBECKY, and             )
JOEL ARIAS,                     )
        Defendants.             )
_____)


### MEMORANDUM & ORDER

GORTON, J.

     This case arises out of a joint investigation by federal,
state and local law enforcement agencies of a heroin and cocaine
trafficking and distribution operation on Cape Cod, Massachusetts.
As a result of that investigation, 16 individuals were arrested
and charged with conspiracy to possess with intent to distribute
100 grams or more of heroin and 500 grams or more of cocaine, in
violation of 21 U.S.C. § 846.  Pending before the Court are
defendants' motions to suppress.

# I. **Procedural History**

The three-count superseding indictment ("the Indictment") charges all defendants with the original conspiracy and separately charges Joel Arias and Delrico Graham with possession with intent to distribute and distribution of 100 grams or more of heroin, in violation of 21 U.S.C. § 841(a)(1). Defendants Stefan Pina, Delrico Graham, Richard Jackson and Thomas Gilson have pled guilty. Defendant Gregory Slayton died earlier this year.

The remaining defendants have moved to suppress:

1) evidence obtained through the use of GPS tracking devices on the vehicles used by Andrews, Hicks and Ford;

2) evidence obtained through police interrogation of Andrews, including his statements and any physical evidence derived therefrom;

3) electronic and wire interceptions and all evidence derived therefrom; and

4) physical evidence seized at 35 Woodland Parkway in Randolph, Massachusetts, 55 Lake Avenue in East Wareham, Massachusetts and 110 Raspberry Lane in Barnstable, Massachusetts.

In addition to the motions to suppress, defendants have filed a motion to sever, a motion for expedited discovery and separate motions for a Franks hearing. The government has opposed all of defendants' motions.

A five-hour hearing on the motions to suppress was held on Friday, August 10, 2012. The Court heard oral argument on the

merits of all of the motions to suppress and presided over an evidentiary hearing to develop the factual record with respect to Andrews' motion to suppress his statements and Hicks's motion to suppress evidence seized at his residence. The Court took the motions under advisement and now renders its decision.

## II.   **Use of GPS Tracking Devices**

### A.   **Facts**

During the investigation, agents installed global positioning system ("GPS") tracking devices on the following four vehicles believed to be operated by co-defendants Kelvin Hicks, Michael Andrews and Omay Ford:

1)   a Lincoln Navigator bearing MA registration 42TA99, registered to Rachel Huffman and operated by Hicks (2/27/09-3/2/10);

2)   a Nissan Stanza bearing MA registration 866GB8, registered to Christine Frye and operated by Andrews (6/4/10-9/9/10);

3)   a Honda Accord bearing Massachusetts registration 251DD5, registered to and operated by Andrews (6/4/10-6/20/10); and

4)   a Mazda 6 bearing Massachusetts registration 632AB6, registered to Shashauna Raposa and operated by Ford (11/16/10).

The GPS devices were monitored by a computer system that gave agents access to both real time and historical location data. The system also transmitted text messages to the FBI case agent when certain activities occurred, such as when a vehicle that had been stationary for an extended period began to move.

**B.    Background Law**

Until recently, the government's use of technology to track the movements of suspects through public areas was not thought to be a "search" implicating the protections of the Fourth Amendment under the theory that suspects have no reasonable expectation of privacy on public roads. See United States v. Knotts, 460 U.S. 276 (1983).  While that doctrine developed in response to the government's use of electronic monitoring beepers, circuit courts were unanimous, until the fall of 2010, that it applied with equal force to the government's use of GPS tracking devices, the technological successor to beepers. See United States v. Marquez, 605 F.3d 604, 609–10 (8th Cir. 2010); United States v. Pineda-Moreno, 591 F.3d 1212, 1216–17 (9th Cir. 2010); United States v. Garcia, 474 F.3d 994, 996–98 (7th Cir. 2007).

In August 2010, the United States Court of Appeals for the District of Columbia Circuit ("the DC Circuit") challenged the consensus by ruling that the use of GPS tracking for 28 days qualified as a Fourth Amendment search. United States v. Maynard, 615 F.3d 544, 555–67 (D.C. Cir. 2010).  According to the Court, the issue was not whether the police could have obtained the same information by lawfully following the defendants on public roads, as the Supreme Court framed the issue in Knotts, but whether such extensive surveillance would be reasonable to expect. Id. at 559. Estimating the probability that a stranger would observe the

entirety of one's movements over the course of a month at "essentially nil," the DC Circuit held that GPS tracking violated the defendant's reasonable expectation of privacy. Id. at 560-67.

Four judges on the DC Circuit criticized the panel decision in Maynard as "inconsistent not only with every other federal circuit which has considered the case, but more importantly, with controlling Supreme Court precedent." See United States v. Jones, 625 F.3d 766, 769 (D.C. Cir. 2010) (Sentelle, J., joined by Henderson, Brown and Kavanaugh, JJ., dissenting from denial of rehearing en banc). Many other courts, including this one, joined in faulting Maynard as contrary to Knotts. See, e.g., United States v. Walker, 771 F. Supp. 2d 803, 808 (W.D. Mich. 2011) (opining that Maynard flew in the face of the "great weight" of authority); United States v. Sparks, 750 F. Supp. 2d 384, 393-96 (D. Mass. 2010) (finding Knotts controlling and the Maynard analysis "legally unconvincing" and "practically unappealing"). If a person lacks a reasonable expectation of privacy while traveling on public roads, those courts reasoned, it makes no difference whether police monitor his movements via an electronic monitoring beeper or a GPS tracking device. In light of the resulting circuit split, the Supreme Court granted certiorari. United States v. Jones, 131 S. Ct. 3064 (2011).

In a decision that came as a surprise to many, the Supreme Court affirmed Maynard and ruled that the government's attachment

of a GPS tracking device to a vehicle and its use of that device to monitor that vehicle's movements on public streets is a search. United States v. Jones, 132 S. Ct. 945 (2012). The majority analyzed GPS tracking under a trespass theory, concluding that a search was effected because the government "physically occupied private property" (the installation) "for the purpose of gathering information" (the monitoring). Id. at 954, 949. Justice Sotomayor joined the majority's trespass theory but wrote separately to express her opinion that GPS tracking qualified as a search under the separate theory that it violated a suspect's reasonable expectation of privacy. Id. at 955-56 (Sotomayor, J., concurring). In a concurring opinion joined by the four remaining justices, Justice Alito criticized the majority opinion's reliance on 18th-century tort law to assess the constitutionality of a 21st-century surveillance technique. Id. at 957 (Alito, J., concurring). In his view, the reasonable expectation of privacy standard was the correct one. Id. at 954. Applying it to the facts, he concluded that installation of a GPS device coupled with long-term monitoring constitutes a search. Id.

For all it decided, the Jones decision left a number of issues unresolved, among them 1) whether the government must obtain a warrant to install and use a GPS tracking device, 2) if not, what quantum of suspicion is required (e.g., probable cause, reasonable suspicion), 3) if the Fourth Amendment is violated,

whether the exclusionary rule requires suppression and 4) if so, what evidence must be suppressed. See id. at 954.

## C.  Analysis

The parties agree that the installation and use of GPS tracking devices, post-Jones, constitutes a "search" under the Fourth Amendment.  They disagree as to whether such a search may be conducted without a warrant, whether the government's failure to get a warrant here requires suppression of evidence and, if so, what evidence should be suppressed.

Defendants assert that Jones forbids the warrantless use of GPS tracking and reason that all evidence "derived from" such tracking must be suppressed under the exclusionary rule.  They seek suppression of 1) the tracking data itself, 2) surveillance observations made and physical evidence seized during the monitoring period and 3) intercepted conversations obtained through wiretaps which relied in any way on GPS tracking data. The government responds that suppression is not required under the good-faith exception to the exclusionary rule.

Stated generally, the good-faith exception provides that evidence obtained in violation of the Fourth Amendment and ordinarily subject to suppression under the exclusionary rule is admissible at trial if police act with an objectively reasonable good-faith belief that their conduct is lawful.  In Davis v. United States, 131 S. Ct. 2419, 2418 (2011), the Supreme Court

extended the good-faith exception to an officer's "objectively reasonable reliance on binding judicial precedent," subsequently overturned.  The Court was not called upon to decide whether the good-faith exception applies when "the law governing the constitutionality of a particular search is unsettled." Id. at 2435 (Sotomayor, J., concurring).  Because the Supreme Court and the First Circuit had not directly addressed, pre-Jones, whether warrantless GPS tracking was permitted under the Fourth Amendment, that issue is now before the Court.

In deciding whether the good-faith exception applies to an officer's reasonable reliance on non-binding precedent, this Court is not writing on a blank slate.  Two district courts, including another Session of this Court, ruled earlier this year that GPS-derived evidence should not be suppressed because, before Maynard and Jones, police had a good-faith basis to believe that the installation and monitoring of a GPS device was not a Fourth Amendment search. See United States v. Baez, No. 10-10275-DPW, 2012 WL 2914318, at *1 (D. Mass. Jul. 16, 2012); United States v. Leon, No. CR 09-00452 JMS, 2012 WL 1081962, at *4-6 (D. Haw. Mar. 28, 2012).  Those cases stand for the proposition that where, as here, officers act in objectively reasonable reliance on a comprehensive body of case law, suppression is not required even in the absence of binding circuit precedent.

Three district courts have taken a contrary position. See United States v. Lee, 11-65-ART, 2012 WL 1880621, at *9 (E.D. Ky. May 22, 2012); United States v. Katzin, No. 11-226, 2012 WL 1646894, at *9-10 (E.D. Pa. May 9, 2012); United States v. Lujan, No. 2:11CR11-SA, 2012 WL 2861546, at *3 (N.D. Miss. Jul. 11, 2012). In their view, extending the good-faith exception to situations in which police rely on non-binding precedent, e.g., a district court opinion, an unpublished opinion by one's own circuit court of appeals or a published opinion by another circuit court of appeals, would give police little incentive to err on the side of constitutional behavior. Suppression, they argue, would serve the beneficial purpose of deterring officers from picking and choosing which law to follow.

If those concerns sound familiar, it is because they were voiced by Justice Sotomayor in Davis. 131 S. Ct. at 2434-36 (Sotomayor, J., concurring). Unfortunately for defendants, her view of the good-faith exception garnered only two other votes, id. at 2436-40 (Breyer, J., joined by Ginsberg, J., dissenting), and was not adopted by the majority, id. at 2426-29. Writing for the Court, Justice Alito emphasized that the "sole purpose" of the exclusionary rule is to deter future Fourth Amendment violations and described suppression as a "last resort." Id. at 2426-27 (majority opinion). The Davis majority rejected a restrictive and reflexive application of the doctrine in favor of

a "rigorous weighing of its costs and deterrence benefits," with a focus on the "flagrancy of the police misconduct." Id. at 2427. As the Court framed the analysis,

> When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.

Id. at 2427-28.

Under that standard, the last resort of suppression is not warranted here because the agents did not "exhibit deliberate, reckless, or grossly negligent disregard" for the constitutional rights of the defendants. At the time agents installed three of the four GPS devices, circuit courts were unanimous in holding that GPS tracking did not so much as implicate, never mind violate, the Fourth Amendment. They installed the fourth GPS device in November 2010, one week after another Session of this Court rejected Maynard as contrary to precedent and unappealing as a matter of principle. Sparks, 750 F. Supp. 2d at 393-96. In relying on the consensus of lower courts and a common-sense reading of Supreme Court doctrine, the agents here acted in good faith and, as a result, the exclusionary rule does not apply.[1]

---

[1] Because the additional GPS discovery sought by the defendants would not alter the Court's analysis of this issue, their motion for GPS discovery will be denied.

That the First Circuit had not yet weighed in at the time of
the GPS installation and monitoring does not compel a contrary
result.  If it did, police in some jurisdictions would be forced
to wait decades to implement new technology or risk suppression
even where, as here, the warrantless use of the technology was
universally considered to be constitutionally permissible.  Such
a bright-line rule would also be unworkable in practice:

> Suppose an officer's conduct is consistent with the
> language of a Fourth Amendment rule that a court of
> appeals announced in a case with clearly distinguishable
> facts? Suppose the case creating the relevant precedent
> did not directly announce any general rule but involved
> highly analogous facts? What about a rule that all other
> jurisdictions, but not the defendant's jurisdiction, had
> previously accepted? What rules can be developed for
> determining when, where, and how these different kinds of
> precedents do, or do not, count as relevant "binding
> precedent"?

See Davis, 131 S. Ct. at 2437 (Breyer, J., dissenting).  Instead
of engaging in a rigorous, cost-benefit analysis focused on the
deterrence value of suppression, as Davis instructed, lower
courts would necessarily spend their limited time deciding
whether a situation is sufficiently analogous to a previous case
to be considered "binding."

Even if it were workable in practice, however, the binding/
non-binding distinction does not jibe with the majority's
pronouncement that suppression is required only where an officer
acts culpably.

> [A]n officer who conducts a search that he believes
> complies with the Constitution but which, it ultimately

turns out, falls just outside the Fourth Amendment's bounds is no more culpable than an officer who follows erroneous "binding precedent." Nor is an officer more culpable where circuit precedent is simply suggestive rather than "binding," where it only describes how to treat roughly analogous instances, or where it just does not exist.

Id. at 2437 (Breyer, J., dissenting). "If the Court means what it now says," Justice Breyer concluded, the good-faith exception would apply when an officer acts in reliance on non-binding precedent as long as he was doing his best to follow the law. Id.

This Court presumes that the Supreme Court meant what it said in Davis and has endeavored to apply faithfully its instructions to the facts of this case. Having concluded that the good-faith exception applies, this Court will not suppress any GPS-derived evidence in this case. In so ruling, this Court is mindful of the concern that authorizing police to rely on non-binding precedent could, in other cases, subvert the purpose of the exclusionary rule by encouraging, rather than deterring, police misconduct. Because that concern is not implicated by the instant set of facts , it is a question best left for another day.

## III. **Interrogation of Andrews**

### A.    **Facts**

On August 10, 2012, the Court held an evidentiary hearing to resolve disputed issues of fact relevant to the determination of whether Michael Andrews was in custody during his encounter with agents on November 19, 2010. The Court heard testimony from

Scituate Police Lieutenant Michael Stewart, Falmouth Police Detective Jamie Pires and FBI Special Agent Timothy Quinn. Defendant Andrews elected not to testify. Having heard the proffered testimony and reviewed the evidence on the record, this Court makes the following findings of fact:

1. On November 19, 2010, Agent Quinn and Lieutenant Stewart contacted Captain Edward Dunne of the Falmouth Police Department and asked to speak to Detective Pires. They met with Detective Pires at the station and explained to him that Andrews, his godson, was implicated in a drug trafficking conspiracy on Cape Cod. They asked Detective Pires to speak to Andrews to see if he would be interested in cooperating.

2. Later that day, Detective Pires spoke to Jeff Andrews, Michael's father by telephone and asked to meet with him and Michael at the family farm on Old Meeting House Road in East Falmouth, Massachusetts. The three men met that afternoon. Detective Pires explained to Jeff and Michael that agents would like to speak with Michael about his involvement in the conspiracy. Michael agreed to meet with the agents.

3. Agent Quinn, Lieutenant Stewart and Captain Dunne arrived shortly thereafter. Andrews directed them to an eight-by-twelve foot office behind the farmstand for the meeting. The office had one door and a small window. Agent Quinn, Lieutenant Stewart and Andrews entered the room and remained there during the meeting.

Detective Pires and Captain Dunne stayed by the door or paced outside the room.

4. Agent Quinn showed Andrews a transcript of a recorded phone call between Andrews and Russell Rose which implicated Andrews in the conspiracy. Quinn informed Andrews that he a) was facing significant jail time for his involvement, b) would not be arrested that day but c) would eventually have to answer for his crimes.

5. Agent Quinn then informed Andrews that he was free to leave but that agents would like to speak with him about cooperating. In particular, they wanted to know where Kelvin Frye and Russell Rose might have stored firearms, drugs and cash. In exchange for his cooperation, Agent Quinn offered to request leniency but made no promises. Agent Quinn also told Andrews that he should not lie to them and suggested that remaining silent would be better than making false statements that could be used against him. Andrews was not given <u>Miranda</u> warnings.

6. At some point during the interview, Andrews asked if he could consult with a lawyer. Agent Quinn responded that he could do so but told him that the matters on which they wanted his cooperation were time sensitive. After considering the matter, Andrews elected not to speak with a lawyer at that time.

7. Andrews told the agents what he knew and agreed to provide additional details at a later date. When his girlfriend

called him on his cell phone, Andrews ended the meeting and left. The interview lasted 20 to 30 minutes.

### B.  Analysis

Andrews moves to suppress the statements he made to Agents Agent Quinn and Lieutenant Stewart on grounds that they were made during a custodial interrogation conducted without proper Miranda warnings.  The government concedes that Andrews was interviewed without Miranda warnings but maintains nonetheless that he cannot make out a Fifth Amendment violation because he was not in custody during the interview.

The obligation to warn an individual of his Miranda rights arises only when that individual has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444 (1966).  A formal arrest triggers Miranda protections but is not a prerequisite. United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011).  Where, as here, a defendant was questioned by police but not immediately arrested, the district court looks to the circumstances surrounding the questioning and determines "whether those circumstances would cause a reasonable person to have understood his situation to be comparable to a formal arrest." Id.  Among the factors guiding this analysis are the location of the questioning, the number of officers, the degree of physical restraint and the duration and character of the interrogation. Id.

The defendant compares his situation to the one presented in United States v. Mittel-Carey, 493 F.3d 36 (1st Cir. 2007). There, eight armed agents executed a search warrant at the defendant's home early in the morning. Id. at 38. They found the defendant in a dark bedroom, ordered him to dress and go downstairs, told him where to sit, separated him from his girlfriend, interrogated him for nearly two hours and remained with him on the three occasions they permitted him to move. Id. The First Circuit held that the defendant was in custody during the questioning, given

> (1) the early hour of the search and interrogation (6:25 AM); (2) the presence of eight officers in the home; (3) that the defendant was confronted with an unholstered gun in his darkened bedroom; (4) the physical control the agents maintained over the defendant at all times; (5) the length of the interrogation (ninety minutes to two hours); and (6) the coercive statements made by the interrogating agent, which seemed designed to elicit cooperation while carefully avoiding giving the defendant Miranda warnings.

Id. at 40. Of those factors, the most important was "the level of physical control that the agents exercised over the defendant during the search and interrogation." Id.

The government responds that this case lacks the crucial element of physical control present in Mittel-Carey and is instead analogous to Oregon v. Mathiason, 429 U.S. 492 (1977), and Yarborough v. Alvarado, 541 U.S. 652 (2004), cases in which defendants were found not to have been in custody where they came to police interviews voluntarily, were not threatened or

restrained and were permitted to leave afterward. The Supreme Court remarked in Mathiason that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it," and clarified that Miranda warnings are required only where there is a meaningful restraint on the suspect's freedom of movement. 429 U.S. at 498.

The government has the better of the argument. The interview was conducted in familiar surroundings by plainclothes police officers. Andrews attended of his own accord and was not prevented from leaving. Although the agents sat or stood between him and the door, they did not restrain him and the door remained open during the questioning. The meeting was relatively brief, Andrews himself ended the conversation. His freedom to depart was not restricted in any meaningful way.

That the agents revealed incriminating evidence against him and informed him that he faced imprisonment undoubtedly made the encounter intimidating but did not make it custodial:

> [A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.

Mathiason, 429 U.S. at 495. Because the inculpatory statements made by Andrews during the interview were not the product of a

custodial interrogation, they will not be suppressed.

Andrews' secondary claim that the agents failed to respect his right to counsel during the meeting is unavailing "because someone not in custody has no constitutional right to counsel." See United States v. Malcolm, 435 F. App'x 417, 420 (6th Cir. 2011); see also Davis v. United States, 512 U.S. 452, 456-57 (1994) (explaining that the Fifth Amendment right to counsel attaches only after a suspect is in custody and the Sixth Amendment right to counsel attaches only at the commencement of adversarial criminal proceedings).

## IV. **Interception of Electronic and Wire Communications**

The Defendants argue that the applications for wiretap warrants did not meet statutory criteria and submit that any inculpatory evidence obtained as a result of the wiretaps must therefore be suppressed.

### A. **Facts**

During the course of the investigation, United States District Judge Patti Saris issued eight orders authorizing the interception of wire communications from seven target telephones used by defendants Rose, Frye, Andrews, Graham and McGee-Baker. The corresponding wiretap applications were supported by separate affidavits submitted by Agent Quinn. Interception of wire communications between the defendants led to the seizure of over 2.3 kilograms of heroin.

**B. Law and Standard of Review**

Before authorizing the interception of wire communications pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq. ("Title III"), the issuing judge must find, based on the application and supporting affidavits, 1) probable cause to believe that "an individual is committing, has committed, or is about to commit" a criminal offense and "communications concerning that offense will be obtained through such interception" and 2) that other investigative techniques have failed, appear unlikely to succeed or are too dangerous. 18 U.S.C. § 2518(3)(a)-(b). For ease of reference, they will be referred to as the "probable cause" and "necessity" requirements.

Communications intercepted through a wiretap and "evidence derived therefrom" are subject to suppression under Title III if the wiretap authorizing their interception does not meet the above statutory criteria. See 18 U.S.C. § 2515. In reviewing a wiretap order of another judge, this Court does not make a de novo determination of sufficiency. United States v. Gianelli, 585 F. Supp. 2d 150, 154 (D. Mass. 2008). Rather, it examines the face of the affidavit and decides whether the facts set forth in the application are "minimally adequate" to support the determination that was made. Id.

## C.  Analysis

Defendants filed three motions to suppress evidence obtained through the wiretaps.  The joint motion to suppress filed by defendants McGee-Baker, Andrews, Rose, Ford and Wobecky challenges the government's showing of necessity.  Frye's motion to suppress challenges the government's probable cause and necessity showings with respect to each of the eight warrant applications.  Vaughn's one-page motion to suppress states simply, in conclusory fashion, that conversations intercepted through the wiretaps violated Title III.  In a consolidated opposition, the government responds that the wiretap warrants were amply supported and several defendants lack standing to challenge them.

### 1.  Probable Cause

Frye attacks the government's probable cause showing on every conceivable basis.  He claims that the warrant affidavits do not establish probable cause to believe that he owned or used the target phones or that the other co-conspirators used, were using or would use those phones in furtherance of the conspiracy. He also contends that 1) information purportedly connecting him to the crime was stale and thus irrelevant to the conspiracy alleged, 2) certain information in the affidavit came from unreliable sources and was not corroborated, 3) many of the affiant's statements were conclusory or boilerplate and

4) there are inconsistencies in the warrant affidavits.  Contrary
to the briefs of his co-defendants, he supports his assertions
with references to specific paragraphs in the warrant affidavit.

Frye does an admirable job of denigrating the government's
wiretap application but ultimately does not persuade this Court
that the facts set forth therein are not "minimally adequate" to
support the probable cause determination made by Judge Saris.
The wiretap affidavits provided ample evidence that the targeted
individuals were using the target phones for drug trafficking.
Many of the target phones were used in connection with controlled
cocaine purchases by confidential informants, supervised by law
enforcement officers.  The wiretap affidavits describe the basis
for Agent Quinn's assessment of the informants' reliability,
including the duration and significance of their cooperation.
Information provided by them was corroborated and supplemented
through other investigative techniques, including surveillance
and common-call analysis.  Several drug-related calls involving
Andrews, Jackson, Frye and Pina were intercepted using the first
wiretap.  Those calls, in addition to the evidence described
above, provided probable cause for the remaining wiretaps.

### 2.  Necessity

In their joint motion challenging the necessity of the
wiretap, defendants argue that the government's use of standard
techniques, including physical surveillance, undercover agents,

prison tapes, traffic stops, trash examination, GPS tracking, controlled purchases, confidential informants, pen registers and search warrants, supplied more than enough evidence against the main players of the conspiracy.  They contend that the continued use of such techniques, in combination with the exercise of the government's grand-jury subpoena powers, would have yielded the evidence sought without resorting to a wiretap.  They maintain that the wiretap was requested not out of necessity but out of a desire to obtain more evidence on top of the mountain of evidence the government already had.  They also accuse the government of bootstrapping necessity showings from earlier warrant applications into extensions and subsequent applications.

The government acknowledges that its use of traditional investigative techniques garnered substantial evidence against the defendants and might have led to additional evidence had the government continued to use them in lieu of a wiretap.  It maintains nonetheless that such measures, which had been pursued for more than two years before resorting to the wiretap, would not have enabled agents to identify the suppliers of the drugs, determine the roles of all the conspirators or achieve other important investigative goals.

To establish necessity, the government must show that it has made

> a reasonable, good faith effort to run the gamut of
> normal investigative procedures before resorting to means

> so intrusive as electronic interception of telephone calls.

United States v. Cartagena, 593 F.3d 104, 109 (1st Cir. 2010). It need not demonstrate that other investigative methods had been exhausted or, if attempted, had been wholly unsuccessful. Id.; see also United States v. David, 940 F.2d 722, 729 (1st Cir. 1991) (noting that a wiretap application "need not be based on proof positive that, without electronic assistance, a promising investigation is up a blind alley[, only that a wiretap] seems a suitable next step in a plausible progression").

The defendants' challenge to the necessity determination is unpersuasive. In complex drug trafficking conspiracies such as this one, the First Circuit has taken a flexible view of when a wiretap is necessary. See, e.g., David, 940 F.2d at 728. Despite defendants' claims to the contrary, the issue is not whether a wiretap is necessary to charge or convict a suspect of a crime but whether it is necessary to achieve reasonable objectives of the investigation. United States v. Martinez, 452 F.3d 1, 6 (1st Cir. 2006). The government sought to dismantle the drug distribution network by getting at its source, a reasonable goal. The wiretap affidavits contain a detailed explanation of the traditional kinds of investigative techniques used and the reasons why such techniques alone or in combination would not achieve the goals of the investigation. The warrant application thus provided a more than adequate basis for Judge Saris to

conclude that a wiretap was necessary to achieve the government's investigative objectives.

### 3. Conclusion

Judge Saris did not err in finding "probable cause" and "necessity" in this case. Because the government discharged its statutory burden under Title III, the Court declines to address the standing issue.

## V. <u>Searches of Residences and Vehicles</u>

Defendants Rose, Ford, Hicks and Frye move to suppress evidence seized during searches of their respective residences and vehicles.

### A. Facts

#### 1. Search of Residence and Vehicles at 35 Woodland Parkway (Rose and Ford)

On November 15 and 16, 2010, agents intercepted a series of telephone calls between Russell Rose, an individual believed to be one of the ringleaders of the drug conspiracy, and Omay Ford, an individual believed to be Rose's supplier. Those calls led agents to believe that a large-quantity drug transaction was planned on November 16 at Rose's residence, located at 35 Woodland Parkway in Randolph, Massachusetts.

That evening, without a search warrant or arrest warrant, agents went to Rose's residence, knocked on the door and identified themselves as police officers. Through a window,

agents observed Rose and Ford talking in the living room and counting stacks of money. When the agents announced their presence, they observed Rose and Ford yell, grab unknown items from the couch and the floor, rush up the stairs and disappear from sight. The agents entered the residence, arrested Rose and Ford and "froze the scene" while they applied for a search warrant.

At 2:49 p.m. on the next day, November 17, 2010, United States Magistrate Judge Jennifer Boal issued a search warrant for 35 Woodland Parkway, finding probable cause to believe that Rose and Ford conspired to commit federal drug offenses and that Rose's residence and the two vehicles parked outside contained evidence of those offenses. Agents executed the search warrant at 3:56 p.m. and seized $75,000 in United States currency, two kilograms of cocaine, four plastic bags of marijuana, four cellphones, financial documents and an address book.

### 2. Search of 55 Lake Avenue (Frye)

On November 16, 2010, agents intercepted phone calls between Rose and Frye which led them to believe that Rose intended to re-sell to Frye, for $28,000, one of the two kilograms of cocaine he purchased from Ford. Agents observed Frye give the cash to Rose at a CVS in Wareham that evening shortly before Ford and Rose were arrested. Based on that and other evidence gleaned during the course of the investigation, FBI Special Agent Stephen

Trombley applied for a warrant to search Frye's residence at 55
Lake Avenue in East Wareham, Massachusetts.

On November 18, 2010, United States Magistrate Judge Robert
Collings issued the search warrant, finding probable cause to
believe that Frye conspired to distribute controlled substances
and his residence contained evidence of that offense.  The search
warrant authorized officers to seize "[i]tems, documents, records,
files, and other information that constitutes evidence or fruits"
of the charged federal drug offense, including 1) evidence
manifesting dominion and control over the premises,
2) documentary evidence relating to the financing, transportation,
ordering, sale and distribution of narcotics, 3) evidence
relating to the use of narcotics proceeds, 4) cellphones, 5) tax
returns and 6) books or papers containing the contact information
of members of the trafficking organization.  The next day,
officers executed the search warrant at Frye's residence and
seized, among other things, financial documents in the master
bedroom, three cellular telephones, $1,800 in cash and an Accu
Banker cash counter.

### 3.    Search of 110 Raspberry Lane (Hicks)

On March 30, 2011, the government applied for and received a
warrant to search the residence of Kyle Hicks, an individual
believed to be another ringleader of the conspiracy, at 110
Raspberry Lane in Marstons Mills, Massachusetts.  Relying on the

evidence set forth in a 25-page affidavit of Agent Quinn, Magistrate Judge Collings found probable cause to believe that Hicks conspired to commit federal drug offenses and that his residence contained evidence of those offenses. The search warrant authorized the agents to seize "[i]tems, documents, records, files, and other information that constitutes evidence or fruits" of the charged federal drug offenses, including 1) evidence manifesting dominion and control over the premises, 2) documentary evidence relating to the financing, transportation, ordering, sale and distribution of narcotics, 3) evidence relating to the use of narcotics proceeds, 4) cellphones and 5) books or papers containing the contact information of members of the trafficking organization.

The execution of that search warrant was the subject of an evidentiary hearing at which the Court heard testimony from officers who were present, including John Doble, a detective with the Bourne Police Department, Travis Ostrem, a special agent with the FBI, and John Murphy, an officer with the Barnstable Police Department. Having heard the proffered testimony and reviewed the evidence on the record, this Court makes the following findings of fact:

1. On March 31, 2011, teams of law enforcement officers from the FBI, state police and local police departments executed arrest warrants against 12 defendants in this case. At

approximately 6:00 a.m. that morning, a SWAT team executed warrants to arrest Hicks and search his residence.

2. After the arrest, Detective Doble showed the search warrant to Rachel Hicks, the defendant's wife, and explained that officers were going to search the house. He asked her if they would find any firearms or contraband in the house. Ms. Hicks led the officers to the kitchen and alerted them to marijuana in a metal container on the stove, in an amount consistent with personal use. She next led them to the bedroom and pointed out $5,000 in rolled-up U.S. currency and a small baggie of marijuana on the dresser. Ms. Hicks was placed under arrest for possession of narcotics, taken into custody and transported to the Barnstable police station for booking.

3. A more thorough search of the bedroom uncovered a small brick-shaped package, four inches wide and two inches thick, in a shoe in the bedroom closet. Because it was hidden and wrapped in a way consistent with the secreting of narcotics, officers seized the item.[2] Officers also found several bottles of Inositol powder commonly used as a cutting agent for cocaine as well as several baggies containing a black substance believed to be narcotics.

4. A search of the rest of the house yielded more items believed to be contraband. Officers found, in the back of the

---

[2] It was later discovered to contain motorcycle parts.

basement freezer, four plastic bags containing a black substance believed to be narcotics.  They also found a loaded handgun hanging above the door frame in the linen closet.

5. As a result of the discovery of contraband during the initial search, Agent Quinn applied for and obtained a follow-up search warrant authorizing agents to expand the search to include "firearms, controlled substances and paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances."  The agents then continued the search of Hicks's residence and seized the drugs and drug paraphernalia, the handgun and ammunition, cash, jewelry, cellphones and drug ledgers.  The two searches lasted approximately eight hours.

**B.  Analysis**

Rose, Ford, Frye and Hicks challenge the searches on a variety of grounds.  Rose, Frye and Hicks claim that the search warrants were deficient in the absence of probable cause to believe that evidence of drug offenses would be found at their residences.  Rose and Ford argue that the evidence seized during the execution of the search warrant at Rose's residence should be suppressed as the fruit of the government's initial warrantless entry into Rose's home.  Hicks contends that the search of his residence exceeded the scope of the warrant.  The three challenges will be addressed <u>seriatim</u>.

### 1. Probable Cause

#### a. Nexus Challenges

Rose, Frye and Hicks assert that there was an insufficient nexus connecting their residences to drug trafficking, i.e., that the only such evidence adduced in the warrant affidavits was boilerplate speculation that drug traffickers store evidence at their homes.

Hicks's challenge is contrary to the evidence. Drug paraphernalia had been seized from trash recovered at his prior residence on numerous occasions and recorded conversations revealed that his residence at 110 Raspberry Lane had been the subject of a home invasion in which drugs and proceeds of drug trafficking had been stolen. Such evidence enabled the reviewing judge to draw a reasonable inference that evidence of Hicks's ongoing drug trafficking activities would be found at his current residence.

As for Rose and Frye, it is true that the government had little evidence connecting drug trafficking activities to their residences. There was, however, substantial evidence that both men were long-time, large-scale drug traffickers. For example, just two days before agents applied for a warrant to search their residences, agents observed Frye paying $28,000 in cash to Russell Rose in exchange for one kilogram of cocaine. Based on the totality of the circumstances, it was reasonable for the

reviewing judge to infer that confirmed drug traffickers such as Rose and Frye would store inculpatory evidence of their drug-trafficking activities, such as cash from drug sales and for drug purchases, customer records and cell phones, in their residences. See United States v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999).

### b.   Staleness Challenge

Hicks claims, in addition, that evidence described in the warrant affidavit was stale and did not support the inference that he continued to sell drugs after his co-conspirators were arrested.  Specifically, Hicks maintains that a period of six months elapsed between the discovery of evidence linking him to the conspiracy and the issuance of the search warrant.

Of particular relevance to his staleness challenge is the fact that the drug trafficking activities forming the basis for the charge against Hicks were alleged to have taken place continuously over a long period of time. United States v. Nocella, 849 F.2d 33, 40 (1st Cir. 1988) ("A primary consideration in evaluating the staleness issue is whether the affidavit describes a single transaction or a continuing pattern of criminal conduct.").  It is reasonable to infer, absent evidence to the contrary, that an established drug dealer will continue to sell drugs and that non-perishable evidence, such as records, cell phones and cash, accumulated over years of dealing, will be found

at his residence. See Feliz, 182 F.3d at 87 (rejecting defendant's staleness challenge on those grounds and noting that courts have upheld determinations of probable cause in trafficking cases where evidence is as much as two years old).

### 2. Warrantless Entry into Rose's Residence

Rose and Ford claim that the evidence seized during the execution of the search warrant should be suppressed as fruit of the government's initial warrantless entry into Rose's home. They submit that agents knew two hours before the entry that a drug deal was scheduled to take place between Ford and Rose at Rose's residence. Instead of getting a search warrant, 15 agents purportedly surrounded the house, guns drawn, and manufactured an exigent circumstance to authorize their entry. Agents took shortcuts, Rose and Ford claim, and they should not be awarded for it.

The Court agrees that the initial, warrantless entry into Rose's residence appears to have been made in bad faith. It strikes the Court as unlikely that, had Ford and Rose not reacted as they did to the police, the 15 officers surrounding the house would have holstered their weapons and withdrawn. Nevertheless, suppression of the evidence seized during the execution of the search warrant is unwarranted for two independent reasons.

First, the initial warrantless entry into Rose's residence was justified under the exigent circumstances doctrine.

Warrantless entry into a residence to prevent the destruction of evidence is allowed under the Fourth Amendment as long as there is a genuine exigency which the police did not create by engaging (or threatening to engage) in conduct that violates the Fourth Amendment. Kentucky v. King, 131 S. Ct. 1849, 1862 (2011). Officers do not "create" an exigency merely by knocking on a suspect's door and announcing their presence. Id. at 1863. It matters not whether they 1) "deliberately created the exigent circumstances with the bad faith intent to avoid the warrant requirement," 2) reasonably foresaw that their tactics "would create the exigent circumstances," or 3) employed a knock and announce strategy instead of getting a search warrant, even though they had evidence "sufficient to establish probable cause to search particular premises," id. at 1859-60.

It is undisputed that the officers knocked on Rose's door, rang the doorbell and announced, "Police, can you open the door?" It is also undisputed that Rose and Ford yelled, grabbed unknown items from the couch and the floor, rushed up the stairs and disappeared out of sight. Given that response, the police were justified in entering the house to prevent the destruction of contraband which they had probable cause to believe was in the house. Because Rose and Ford "cho[]se not to stand on their constitutional rights but instead elect[ed] to attempt to destroy evidence," they "only have themselves to blame" for the response

-33-

of the police. Id. at 1862.

Second, the evidence seized during the execution of the
search warrant is admissible under the independent source
doctrine. Where, as here, police enter a house without a
warrant, arrest a suspect, freeze the scene, remain in the house
until a search warrant is issued and then execute the warrant,
the evidence seized pursuant to that warrant is not subject to
suppression as long as "none of the information on which the
warrant was secured was derived from or related in any way to the
initial entry." Hudson v. Michigan, 547 U.S. 586, 600 (2006)
(quoting Segura v. United States, 468 U.S. 796, 814 (1984)).
Because the evidence Agent Quinn marshaled in support of the
search warrant application "came from sources wholly unconnected
with the entry and was known to the agents well before the
initial entry," it is "beyond dispute" that the drugs, cash and
other evidence seized are not subject to suppression. Segura, 468
U.S. at 814.

### 3. Search Exceeded Scope of Warrant

Finally, Hicks argues that the first search exceeded the
scope of the warrant. He asserts that rather than limit their
search to records, proceeds and cellphones, as the original search
warrant authorized, the executing officers searched for drugs and
guns and, only after they found them, sought a second search
warrant authorizing a broader search. According to Hicks, the

-34-

officers knew that they lacked probable cause to search for drugs
and guns at the outset so they requested a search for records as
a pretext to get into the house and search for the drugs and guns
they were really after.  As evidence of their true motivation,
Hicks points out that the first question posed by officers
executing the search warrant was whether they were going to find
guns or drugs in the house.

That the officers' underlying objective may have been to
find drugs or that they applied for the documentary search
warrant with that expectation in mind are "of no matter." See
United States v. Ribeiro, 397 F.3d 43 (1st Cir. 2005) (rejecting
defendant's argument that a documentary search warrant was "a
mere pretense because the police intended to search for drugs
from the outset"); see also Horton v. California, 496 U.S. 128,
138-39 (1990) ("The fact that an officer is interested in an item
of evidence and fully expects to find it in the course of a
search should not invalidate its seizure if the search is
confined in area and duration by the terms of a warrant.").
Arguments premised on the motivation or expectation of executing
officers are therefore "a dead end." Ribeiro, 397 F.3d at 52.

The salient issue is whether the search was within the scope
of the warrant.  In general rule is that

> any container situated within residential premises which
> are [sic] the subject of a validly-issued warrant may be
> searched if it is reasonable to believe that the
> container could conceal items of the kind portrayed in

the warrant.

United States v. Crooker, 688 F.3d 1, 8 (1st Cir. 2012).  The
question is whether the items could be secreted in the places
searched, not whether they often are.  Papers and cash might be
stored anywhere inside a house, including a hallway linen closet
and even a basement freezer, so agents were not restricted to
searching desks and piggy banks.  See United States v. Romo-
Corrales, 592 F.3d 915, 920 (8th Cir. 2010) ("[P]aper documents
can obviously fit into small spaces and containers and, therefore,
could be hidden in numerous locations in a residence . . . in the
laundry hamper, garage, cooler, behind a mirror or picture, behind
a dresser, and underneath the bed.").  Indeed, as the government
points out, freezers have been used by drug dealers and United
States Congressmen alike to hide the proceeds of their illegal
activities.  See United States v. Jefferson, 674 F.3d 332, 346
(4th Cir. 2012) (Congressman); United States v. Espino, 32 F.3d
253, 256 (7th Cir. 1991) (drug dealer).

For those reasons, the searches were within the scope of the
original warrant.  The corresponding seizures of contraband were
authorized by the second warrant and, independently, under the
plain view exception to the warrant requirement.  See Crooker, 688
F.3d at 8-9. Defendant's motion to suppress that evidence will
therefore be denied.

## VI.  **Motion for Franks Hearing**

Defendants Rose, Hicks and Frye separately moved for a
Franks hearing to test the veracity of certain statements made by
Agent Quinn.

### A.   **Standard**

A Franks hearing is warranted only if a defendant makes
"substantial preliminary showings" that 1) a false statement or
omission in a warrant affidavit was made knowingly or with
reckless disregard for the truth and 2) the falsehood or omission
was necessary to the finding of probable cause. United States v.
Rigaud, 684 F.3d 169, 173 (1st. Cir. 2012).

### B.   **Application**

According to the defendants, Agent Quinn lied when he stated
that Rose sold drugs to a confidential informant and Hicks owned
and operated E-Customs, a motorcycle-repair business where drug
activities were observed.  They also accuse Agent Quinn of
omitting from the warrant application the success of traditional
investigative methods, the involvement of other law-enforcement
agencies and the possibility that Hicks shared trash barrels with
his neighbors.  They request a Franks hearing.

Defendants have not met their burden of showing that a
Franks hearing is necessary.  Rose's assertion that he has never
sold drugs to anyone is

> the type of conclusory, self-serving statement that courts
> have  repeatedly  concluded  does  not  amount  to  a

substantial preliminary showing warranting a _Franks_
hearing.

_United States_ v. _Moon_, No. 11-10223-DJC, 2012 WL 2178923, at *5
(D. Mass. Jun. 13, 2012) (denying request for _Franks_ hearing
where defendant merely denied that he sold heroin).  That Rose
has a drug conviction on his record does not help his cause.

Agent Quinn's statement that Hicks owned and operated E-
Customs with another individual and his "omission" that Hicks
shared trash barrels with his neighbors do not warrant a _Franks_
hearing because they were not material to the issuance of the
warrant.  Information gleaned from the surveillance of E-Customs
and items found in the trash outside of Hicks's residence were
just some of the evidence in support of the search warrant
application.  There was ample other evidence, including prison
tapes and intercepted phone calls, connecting Hicks and his
residence to the conspiracy.  Moreover, Agent Quinn was not
required to show, beyond a reasonable doubt, that Hicks was the
sole person behind the drug activity at E-Customs or that the
drug paraphernalia found in the trash outside of his house was
definitely his.  The standard was probable cause and it was met.

Frye's claim that Agent Quinn glossed over the success of
traditional investigative methods and the involvement of other
law-enforcement agencies finds no support in the evidence.  Agent
Quinn made no secret of the fact that the investigation was a
joint effort made by federal, state and local law enforcement

agencies and was not bashful about revealing the evidence those agencies had uncovered. His affidavit contained a fair representation of the investigation and was not lacking in detail.

Because defendants have not made a substantial preliminary showing that Agent Quinn intentionally or recklessly made a material false statement or omission in the warrant affidavits, their request for a <u>Franks</u> hearing will be denied.

## VII. **Motion to Sever**

Defendant Anthony Vaughn moves to sever his trial from that of his co-defendants, a motion joined in by defendant Joel Arias.

### A.    **Standard**

The general rule in the First Circuit "is that those indicted together are tried together to prevent inconsistent verdicts and to conserve judicial and prosecutorial resources." <u>United States</u> v. <u>Soto-Beniquez</u>, 356 F.3d 1, 29 (1st Cir. 2004). The preference for a joint trial is particularly strong where the charge is conspiracy. <u>See</u> <u>United States</u> v. <u>Tejeda</u>, 481 F.3d 44, 54 (1st Cir. 2007) ("This rule has particular resonance in drug conspiracy cases, where multiple defendants often share a single indictment.").

To overcome the strong presumption in favor of joint trials in drug conspiracy cases, a defendant must demonstrate "prejudice so pervasive that a miscarriage of justice looms." <u>United States</u> v. <u>Sotomayor-Vazquez</u>, 249 F.3d 1, 17 (1st Cir. 2001). Because a

measure of evidentiary spillover is a consequence of virtually every joint trial, "garden-variety prejudice, in and of itself, will not suffice." <u>United States</u> v. <u>Boylan</u>, 898 F.2d 230, 246 (1st Cir. 1990). Similarly, because co-conspirators usually have different degrees of culpability, a "disparity between the relative culpability of co-defendants does not <u>entitle</u> a defendant to severance." <u>United States</u> v. <u>DeCologero</u>, 530 F.3d 36, 55 (1st Cir. 2007).

## B. Analysis

Vaughn and Arias seek to have their trials severed from that of their co-defendants on the basis that their involvement in the conspiracy, if any, was minimal. Vaughn is alleged to have importuned Frye and Graciani on two occasions to mail him a total of 30 grams of heroin. Arias submits that his "only" involvement in the conspiracy was driving a vehicle which had drugs hidden in a cache beneath it. They each claim that if their trials are not severed, there is a serious risk that the jury will find them guilty by association.

The motions to sever will be denied. Severance is unwarranted because Vaughn and Arias have not demonstrated markedly different degrees of culpability or anything other than garden-variety evidentiary spillover common to any joint trial. Should circumstances arise at trial in which those issues become a concern, the Court will take the necessary remedial action.

**ORDER**

In light of the foregoing, defendants'

1)   motions to suppress evidence obtained through the use of GPS tracking devices on the vehicles of Andrews (Docket No. 350), Hicks (Docket No. 352), Ford (Docket No. 355) are **DENIED;**

2)   motion for GPS discovery (Docket No. 424) is **DENIED;**

3)   motion to suppress inculpatory statements made by Andrews (Docket No. 353) is **DENIED;**

4)   motions to suppress electronic and wire interceptions and evidence derived therefrom (Docket Nos. 358, 360 and 369) are **DENIED;**

5)   motions to suppress physical evidence seized at 35 Woodland Parkway in Randolph, Massachusetts (Docket Nos. 355 and 364), 55 Lake Avenue in East Wareham, Massachusetts (Docket No. 362) and 110 Raspberry Lane in Barnstable, Massachusetts (Docket No. 396) are **DENIED;**

6)   motions to join in the motions of co-defendants (Docket Nos. 370, 372, 373, 375, 376, 378, 379, 381, 382, 383, 384, 385, 429, 430 and 434) are **DENIED** as moot;

7)   motions for a <u>Franks</u> hearing (Docket Nos. 360, 366 and 396) are **DENIED;** and

8)   motion to sever (Docket No. 367) is **DENIED.**


**So ordered.**

                                    /s/ Nathaniel M. Gorton
                                    Nathaniel M. Gorton
                                    United States District Judge
Dated September 14, 2012